AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**6/30/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

June 30, 2025

CENTRAL DISTRICT OF CALIFORNIA
BY: ch DEPUTY

United States of America

v.

Henry Tolliver Sr.,

Defendant

Case No.   2:25-MJ-04035-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 20, 2025 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Robert C. McElroy, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    **June 30, 2025**

_____BMirff_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Brianna Fuller Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA: Matthew J. Tako (x0705)

## AFFIDAVIT

I, Robert C. McElroy, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against HENRY TOLLIVER SR. ("TOLLIVER") for a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

2.    This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), currently in the custody of the Federal Bureau of Investigation ("FBI"), as described more fully in Attachment A:

a.    A black Apple iPhone with unknown model and serial number with a cracked screen and blue case ("SUBJECT DEVICE").

b.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

4.   I am a Special Agent ("SA") with the FBI, and have
been so employed since October 2019.  I am currently assigned to
the Los Angeles Field Division Lancaster Resident Agency, which
is responsible for investigating violent crimes, white collar
crimes, and crimes against children in the cities that fall
within the Lancaster Resident Agency area of responsibility.

5.   Since becoming an FBI Special Agent, I have received
formal training at the FBI Training Academy in Quantico,
Virginia.  This training included segments on conducting
criminal investigations, narcotics identification, organized
crime, and other law enforcement topics.  During the time I have
been employed by the FBI, I have participated in investigations
relating to extortion, criminal threats, fugitives, homicide,
Hobbs Act robberies, murder-for-hire, and other violent crimes.
I have participated in many aspects of criminal investigations,
such as, but not limited to, reviewing evidence, the issuance of
subpoenas, the analysis of pen and trap and trace records,
consensually monitored telephone calls, conducting physical and

electronic surveillance, working with informants, and the
execution of search and arrest warrants.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    On March 20, 2025, the Los Angeles County Sheriff's
Department ("LASD") executed a multi-location search warrant,
which included TOLLIVER's residence located at 44842 Mariposa
Drive, Lancaster, California (the "SUBJECT RESIDENCE").

7.    LASD seized, among other items of contraband, a
plastic container containing suspected methamphetamine, which
was later confirmed by the Drug Enforcement Administration
("DEA") Laboratory.  The drugs had a net weight of approximately
141.5 grams with a 98% purity rating, resulting in approximately
138.6 grams of pure (actual) methamphetamine.  LASD also seized
three digital scales and a container of empty Ziploc bags found
adjacent to the methamphetamine.

8.    In a conversation with Deputies during the search,
TOLLIVER inquired as to whether the Deputies were targeting him
or his son.  When the Deputies advised they were looking for
TOLLIVER's son, they asked TOLLIVER what the drug-like substance
was on the kitchen counter.  TOLLIVER told the Deputies that it
was methamphetamine and that it was his for personal use.  In a
later <u>Mirandized</u> interview, when asked about the
methamphetamine, TOLLIVER referenced the previous conversation
he had with Deputies, where he confirmed the drugs were his for
personal use.

9.   Deputies seized the SUBJECT DEVICE from the living room table, which is the area where TOLLIVER was sitting when the warrant was executed.

### STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, my review of body worn camera footage, and my own knowledge of the investigation, I am aware of the following:

**A.    LASD Deputies Execute a Multi-Location Search Warrant in Palmdale and Lancaster, California**

11.   On March 17, 2025, the Honorable Judge Scott Yang, of the Los Angeles Superior Court, County of Los Angeles, North Judicial District, granted a search warrant for the SUBJECT RESIDENCE and approximately 16 other locations as part of a LASD gang investigation.

12.   On March 20, 2025, at approximately 4:00 A.M., LASD deputies executed a search warrant at the SUBJECT RESIDENCE. After several knock and notice announcements, TOLLIVER acknowledged the presence of the deputies and, approximately 30-60 seconds later, TOLLIVER answered the door.  TOLLIVER advised deputies that he lived at the location and that his wife was asleep inside.  TOLLIVER further told the deputies that there were approximately three to four firearms inside the house. Deputies executed a safety clear and safely detained both occupants for the duration of the search.

**B.    LASD Deputies Search the SUBJECT RESIDENCE and Seize Drugs, Guns, and Other Contraband**

13.    After LASD determined the SUBJECT RESIDENCE was clear of any safety threats, they conducted a thorough search of the SUBJECT RESIDENCE.

14.    Adjacent to the front door, on top of a shoe rack, LASD seized a clear plastic bag containing 21 loose 9mm caliber rounds of ammunition.

15.    In the kitchen, LASD seized the following items:

a.    A plastic container containing suspected methamphetamine located on the kitchen counter next to the refrigerator.  The DEA Laboratory later confirmed with a net weight of approximately 141.5 grams, and had a 98% purity rating, resulting in approximately 138.6 grams of pure (actual) methamphetamine;

b.    A functioning red digital scale directly next to the methamphetamine;

c.    A container of Ziploc bags across from the methamphetamine;

d.    Another functioning black digital scale in the cabinet below the methamphetamine; and

e.    A black duffel bag containing boxes of .22 caliber ammunition, miscellaneous .410 gauge shotgun shells, loaded .22 caliber rifle magazines, two AR rifle magazines, and one .45 caliber pistol magazine.

16.    In the living room, LASD seized the following items:

a.    The SUBJECT DEVICE;

      b.   One functioning black digital scale;

      c.   Three orange prescription pill bottles with labels removed containing unknown pills;

      d.   Various denominations of U.S. currency in the amount of $860; and

      e.   A small black and blue backpack containing two orange prescription pill bottles with labels removed containing unknown pills and a plastic bag containing unknown pills.

17. In the hallway closet, LASD seized a black bag containing loose rifle rounds.

18. In a bedroom at the end of the hallway (a different room from where TOLLIVER's wife was discovered sleeping), LASD seized the following:

      a.   A black Glock 27 pistol located under a pillow on top of the bed;

      b.   A black Pioneer Arms Corporation "Hellpup" AK-47 style rifle with a loaded magazine found underneath the bed;

      c.   A black bag containing a Glock 19X pistol with a large capacity magazine protruding from the magazine well, which was later identified as reported stolen, one Glock 9mm magazine, miscellaneous firearms parts, and loose ammunition;

      d.   Loose ammunition in a small yellow storage bin adjacent to the bed; and

      e.   Mail addressed to Henry Tolliver.[1]

---

[1] TOLLIVER shares the same name as his son, Henry Tolliver.

19.    The photographs below were taken by LASD deputies at the conclusion of their search and displays a portion of the seized items, with a close up of the seized methamphetamine:

 

20.    Based on my training and experience, the large chunks above are consistent the sale of methamphetamine rather than mere personal use.  Users of methamphetamine purchase end-user amounts of the drug -- in much smaller quantities -- in plastic bags.  Distributors of methamphetamine obtain the drug in bulk, often in large chunks, and cut or break down the chunks into end-user amounts that are weighed on a digital scale and placed in separate plastic bags for sale.

**C.    TOLLIVER Admits that the Methamphetamine is His in a Conversation with Deputies and references that conversation in a <u>Mirandized</u> Interview.  TOLLIVER's wife Corroborates His Use of Methamphetamine**

21.    On June 26, 2025, I interviewed LASD Deputy Suarez regarding the statements made by TOLLIVER.  Suarez stated that during the search of the residence, Detectives Perez and Suarez went to the patrol vehicle where TOLLIVER was seated to ask about the whereabouts of TOLLIVER's son, who was the target of

the investigation and reason for the search of the SUBJECT RESIDENCE.  TOLLIVER told the Deputies that his son was away on vacation in Kentucky.  During that conversation the Deputies mentioned the large chunks of a drug-like substance on the kitchen counter.  TOLLIVER told the Deputies that the drugs were methamphetamine and that they were his for personal use.  Suarez told me that the conversation was not recorded because the Deputies intention was not to interview TOLLIVER and that they were trying to determine the whereabouts of TOLLIVER's son.

22.  At the conclusion of the search, LASD Deputy Suarez Mirandized TOLLIVER, who was still sitting in the backseat of an LASD patrol vehicle.  TOLLIVER stated that he understood his rights and agreed to speak to the deputies without an attorney present.  The reading of Miranda Rights and subsequent interview were recorded via body worn camera.

23.  TOLLIVER told the deputies that he lived at the SUBJECT RESIDENCE with his wife and son, Henry Clark Tolliver, and that he was seated on the couch in the living room when the deputies made their knock and announce.  When asked about the orange pill bottles next to where he was seated, TOLLIVER told the deputies that he had a prescription for the medication. TOLLIVER was advised that all the bottles had labels that were removed, and TOLLIVER responded by saying that he should have prescriptions with his name on it in a medicine cabinet.[2]

---

[2] LASD deputies were unable to find prescriptions in TOLLIVER's name anywhere in the SUBJECT RESIDENCE.

24.  TOLLIVER told the deputies that the U.S. currency located on the table next to the couch belonged to him.  When asked about the methamphetamine in the kitchen, TOLLIVER referenced the previous conversation he had with Deputies when he volunteered that the methamphetamine in the kitchen was his and that it was for personal use.

25.  TOLLIVER told the deputies that he was aware that there were firearms in the house, however he didn't know where they were.

26.  Next, the same deputies interviewed Cato Tolliver ("Cato"), TOLLIVER's wife, who was in the backseat of a different patrol vehicle.  The contact was recorded via body worn camera.

27.  Detective Perez advised Cato of her <u>Miranda</u> Rights to which she stated she understood her rights and was willing to talk to the deputies without an attorney present.

28.  Cato stated that she had no knowledge of firearms in the house, however she did possess a small "Daringer" pistol in her bedroom.[3]  Cato told the Deputies that her husband, TOLLIVER, uses Methamphetamine and usually sleeps on the couch.

### IV. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

29.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

---

[3] LASD deputies were unable to find a Daringer pistol in the SUBJECT RESIDENCE.

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.     Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.     Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.     Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

32.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.  Digital devices, specifically Apple products, typically back up their data onto an Apple iCloud account both manually and automatically. If a password to an iCloud account is changed, it may be difficult and/or impossible to retrieve the data that was backed up onto the account, even when having access to the phone.

33.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TOLLIVER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of TOLLIVER's

face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

34.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>CONCLUSION</u>

35.   For all of the reasons described above, there is probable cause to believe that TOLLIVER has committed a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

36.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 30th day of
June, 2025.

_____
HON. BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE